UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE L. SIMMONS,

        Plaintiff,

Case No. 1:08-cv-822

Hon. Robert J. Jonker

vs.

WILLIAM JOHNSTON, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff file a *pro se* civil rights action arising the termination of his position as a part-time laundry attendant at the Holiday Inn West in Kalamazoo (sometimes referred to as "the hotel"). This matter is now before the court on defendants' motion for summary judgment (docket no. 59) and plaintiff's motion for judgment on the pleadings (docket no. 62).

    **I.**    **Procedural Background**

Plaintiff filed a four count complaint against five individual defendants: William Johnston, the "chariman/president/owner" of the hotel; Brad Schmitz, the hotel's general manager; Amanda Appell, the hotel's human resources officer; Sean Gillette, the hotel's operations manager; and Julie Fields, the hotel's laundry department manager. Count I alleged employment discrimination in violation of 42 U.S.C. § 2000e-2(a)(1). Count II alleged retaliation and harassment in violation of 42 U.S.C. § 2000e-3(a)(1). Count III alleged impairment of plaintiff's rights in an employment contract in violation of 42 U.S.C. § 1981. Finally, Count IV alleged intentional discrimination in violation of 42 U.S.C. § 1981a(a)(1) and (b)(1). The court granted defendants' motion for partial summary judgment, dismissing Counts I and II, and all of plaintiff's claims

against defendant Johnston. *See* docket nos. 67, 74. The only matters remaining before this court are plaintiff's claims against defendants Gillette, Appell, Fields and Schmitz as alleged in Counts III and IV.

**II.    Dispositive motions**

**A.    Background**

On June 11, 2009, defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. *See* docket no. 59. On June 17, 2009, plaintiff filed a motion styled as one for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). *See* docket no. 62.[1] Plaintiff's motion for judgment on the pleadings refers to matters outside of the pleadings. Fed. R. Civ. P. 12(d) provides that if a motion brought under Rule 12(c) includes matters outside of the pleadings, and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ. P. 12(d). Defendants construed plaintiff's motion as one seeking summary judgment and filed an appropriate response. *See* docket no. 64. Under these circumstances, the court will view plaintiff's motion for judgment on the pleadings as a cross-motion for summary judgment.

---

[1] Plaintiff's motion was untimely, being filed two days after the June 15, 2009 deadline set for dispositive motions. *See* Case Management Order (docket no. 13). Despite this late filing, the court will consider the motion. Plaintiff did not appear to file the motion in bad faith and defendants do not appear to be prejudiced by the untimely filing. *See Great American Insurance Co. v. United States*, 552 F. Supp. 2d 703, 705-06 (S. D. Ohio 2008)(court denied motion to strike defendant's motion for summary judgment as untimely when defendant did not act in bad faith and plaintiff did not show that they were prejudiced by the late filing).

2

### B. Legal Standard for summary judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### C. Defendants' motion for summary judgment (docket no. 59)

#### 1. Plaintiff's § 1981 claims (Count III)

In Count III, plaintiff alleged that defendants Gillette, Fields, Appell and Schmitz violated his rights under § 1981. The applicable section of the statute, § 1981(a), provides as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

"[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." § 1981(b).

"Section 1981 prohibits racial discrimination in the making and enforcing of private contracts." *Newman v. Federal Express Corp.*, 266 F.3d 401, 407 (6th Cir. 2001). The Supreme Court explained that § 1981 was "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger*, 539 U.S. 244, 276 (2003), quoting *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 295-96 (1976).

A court's analysis of a § 1981 claim is essentially the same as a Title VII claim alleging employment discrimination, with one important exception. Unlike Title VII, individuals may be held liable for violations of § 1981. *See Jones v. Continental Corporation*, 789 F.2d 1225, 1231 (6th Cir. 1986); *Wagner v. Merit Distribution*, 445 F. Supp. 2d 899, 909 (W.D. Tenn. 2006). To establish individual liability under § 1981, the individual defendant must have been personally involved in the discriminatory action. *Wagner*, 445 F. Supp. 2d at 909; *Allen v. Ohio Dept. of Rehabilitation and Correction*, 128 F. Supp. 2d 483, 495 (S. D. Ohio 2001). The personal involvement required for § 1981 liability includes direct participation in the alleged violation, as well as gross negligence in the supervision of the subordinates who committed the wrongful acts and the failure to take action upon receiving information that constitutional violations are occurring.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2nd Cir. 2004). *See Amin v. Quad/Graphics, Inc.*, 929 F. Supp. 73, 78 (N.D. N.Y. 1996) ("[t]he element of personal involvement may be satisfied by proof that a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them").

Under either § 1981 or Title VII, an employee may prove discrimination in two ways. First, a plaintiff may put forth "direct evidence that the defendant had a discriminatory motive in carrying out its employment decision." *Smith v. Chrysler*, 155 F.3d 799, 805 (6th Cir. 1998). Such evidence would take the form of a statement such as "I fired you because you are disabled." *Id.* Second, a plaintiff may prove indirect discrimination by utilizing the burden-shifting approach as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Smith*, 155 F.3d at 805. *See also Newman*, 266 F.3d at 407 (§ 1981 claims are analyzed under the Title VII *McDonnell Douglas* framework).

In this case, plaintiff testified that his § 1981 claim was based upon direct evidence of discrimination, i.e., a discriminatory statement made by defendant Gillette which affected plaintiff's "oral agreement" to work at the hotel. Simmons Dep. at 92-93 (docket no. 60-3). However, in his dispositive motion, plaintiff sets forth the *McDonell Douglas* framework which indicates that he is also asserting a claim of indirect discrimination. Accordingly, the court will review plaintiff's claim as including both direct and indirect evidence of discrimination.

    **a.**    **Plaintiff has not demonstrated direct evidence of discrimination**

When claiming direct evidence of discriminatory motive, a plaintiff must demonstrate that a decisionmaker made the offending statement.

> Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360

F.3d 544, 550 (6th Cir.2004). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir.1998) (internal quotation marks omitted) (alterations in original).

*Geiger v. Tower Automotive*, -- F.3d ---, 2009 WL 2836538 at *4 (6th Cir. 2009).

At his deposition, plaintiff explained the facts surrounding Gillette's statement, which lies at the heart of this lawsuit:

> A. Okay. That would come from Sean, Sean Gillette, wherein I reported to him that Jennifer said she was going to work me like a slave; he stated, history repeats itself.
>
> Q. What about that do you perceive to be discriminatory?
>
> A. It was bigotry (phonetic) -- it was a -- it was -- the remark was a -- was a bigotry remark that was --
>
> Q. Bigotry?
>
> A. Yeah.
>
> Q. I'm sorry. I don't understand.
>
> A. It was a bigot remark that -- him indicating that history repeats itself, from Jennifer saying that she was going to work me like a slave, was a remark that I perceived to be discriminatory itself, because he was referring to history as black people being worked like slaves.
>
> Q. Okay. So some reference to your race?
>
> A. Yes.
>
> \*       \*       \*
>
> Q. When did this happen?
>
> A. This was in -- that was -- that was April 15th of '07.
>
> Q. April 15th of 2007?
>
> A. Yes.

* * *

Q. When did she make the statement?

A. She made it a couple days before that, before the 15th.

Q. Where were you when she made the statement?

A. Downstairs in the laundry department.

Q. And what was the conversation, the context of the statement?

A. She -- I told her that she would have to pull the laundry out of the washers and put it in the dryers that day. And she was saying -- she told me, no, she wasn't going to do it. I said, well, I'm not going to do it. She said, I'll work you like a slave. And I was like --

Q. Let me make sure I understand. Jennifer was a coworker?

A. Yes.

Q. She wasn't your supervisor?

A. No.

Q. And you weren't hers?

A. No.

Q. Okay. So you were peers?

A. Right.

* * *

Q. All right. And what did you say when she said, "I'll work you like a slave"?

A. I just shook my head. I didn't say anything to her after that.

Q. All right. So a few days later you spoke to Sean Gillette?

A. Yes.

7

> Q. And told him what she said?
>
> A. Yes.
>
> Q. Tell me what you said to Sean.
>
> A. I told him that I had told Jennifer that it was her turn to pull the laundry out of there, and she told me she wasn't going to do it and she was going to work me like a slave. And he kind of laughed and said, "Well, I guess history repeats itself."
>
> Q. Did you ask him what he meant by that?
>
> A. No.
>
> Q. Did he say anything else?
>
> A. No.
>
> Q. Was anyone else present?
>
> A. No.

Simmons Dep. at 74-77.

Plaintiff commenced his employment at the hotel in December 2006. Simmons Dep. at 7. On December 6, 2006, plaintiff signed a document which stated that he was an at will employee and provided in pertinent part as follows:

> All Hotel employees are at will employees and, as such, are free to resign at any time for any reason. The Company, likewise, retains the right to terminate an associate's employment at any time for any reason. Nothing contained in any other document provided to employees is intended to be, nor should be, construed as a guarantee that employment or any benefit will be continued for any period of time. Any salary figures provided to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended to, and do not, guarantee employment or any benefit for any period of time.

*See* docket no. 60-3 at p. 73. It is undisputed that plaintiff was terminated at a meeting on Monday, October 1, 2007. *See* docket no. 60-4 at p. 11; Simmons Dep. at 69-72; Appell Aff. at ¶¶ 15-16.

8

The incidents that immediately precipitated the termination of plaintiff's employment occurred on Friday, September 28, 2007. On that date, "the hotel was particularly busy because the third floor was having a late 'flip' or room turnover" and Fields asked for "all hands on deck." Fields Aff. at ¶ 9. Plaintiff was scheduled to work 8:00 a.m. to 1:00 p.m. Simmons Dep. at 52. Fields asked plaintiff if he could work later than 1:00 p.m. *Id.* Plaintiff said "no" and told Fields that he was "scheduled from 8 to 1." *Id.* Fields told plaintiff that she wanted him to stay longer because they were having a "flip" on the third floor. *Id.* at 53. Plaintiff told Fields "that the oral agreement [for his employment] was from 8 to 1, Monday through Friday, excluding weekends." *Id.* Plaintiff was not willing to deviate from this schedule. *Id.* Plaintiff and Fields went to see Appell. *Id.* at 53-54. Plaintiff and Appell talked about working from 8 to 1, and she discussed that they were having a flip that day. *Id.* at 54. Appell told plaintiff that the "agreement" to work 8 to 1 was never written down or guaranteed. *Id.*

In her affidavit, Appell stated that throughout 2007, the hotel's business dictated the need to change plaintiff's schedule to a full-time position. Appell Aff. at ¶ 7. Appell attempted to accommodate plaintiff's preferred schedule of 8:00 a.m. to 1:00 p.m. "by pulling staff from Housekeeping to work additional hours beyond 1:00." *Id.* The hotel also hired new workers to cover afternoons, but these were school age workers who required supervision and had "limited and unreliable availability." *Id.* Plaintiff does not deny that this was the case, conceding that Appell may have told him that "the hotel would schedule people based on business needs." Simmons Dep. at 54.

At some point during the conversation, plaintiff presented Fields with a proposed work schedule or contract for Appell and Fields to sign:

9

> I presented Julie [Fields] a winter schedule, which was my personal winter schedule, and I -- because they was asked -- they were having problems with me not working past 1:00. And I said, well, what I can do is I can add another hour and a half on there, if you would accept that, but it -- this one would have to be in writing.

*Id.* at 55. Fields and Appell refused to sign plaintiff's "personal winter schedule." *Id.*

Plaintiff testified that Appell gave him the following options:

> What she said was that if you refuse to work past 1:00 I can reduce your hours on the schedule, I could terminate you -- let's see, that was -- reduce my hours, she said, and she said she could terminate me. I think that was it. I think that was it. I think she said she could either reduce my hours or she could terminate me -- . . . if I refuse to work past 1:00.

*Id.* at 54-55. Ultimately, plaintiff told Appell that "if there was a dispute about this, the best way to resolve it would be in court." *Id.* at 56. When plaintiff left Appell's office to clock out, she asked him to come back, and he said "I don't have to." *Id.* at 56-57. After Appell told plaintiff to clock out, he said something like, "This is bullshit." *Id.* at 56.

When plaintiff arrived for work on Monday, October 1, 2007, Fields escorted him to an office, where plaintiff met with Appell and Schmitz. *Id.* at 70. Plaintiff characterized the discussion as follows:

> When I came in there and sat down, Brad [Schmitz] said -- well, actually when I sat down Amanda [Appell] told me that she was going to terminate my employment; and at that time Brad Schmitz said that he fully supports his supervisor and manager's decisions. And then I told him, I said, well, wait a minute, hold up, you know. And when I told him to hold up, he stopped talking, and that was it. That was the decision, her decision to terminate.

*Id.* at 71.

The October 1, 2007 "termination request/report form" states that plaintiff's employment termination was involuntary for "insubordination." Plaintiff testified that he understood that, from defendants' point of view, he was terminated for being insubordinate and for

10

not being able to work the hours they needed. Simmons Dep. at 105. Plaintiff testified that neither Appell, Fields nor Schmitz had ever made any racist statements to him. *Id.* at 86.

As an initial matter, plaintiff's § 1981 claim alleged in Count III is limited to acts performed by defendants Schmitz, Appell and Fields, in their individual capacities "as the trained General Manager, Human Resources Officer and Manager." Compl. at ¶¶ 46-50. Plaintiff does not allege that defendant Gillette violated § 1981. For this reason alone, it appears that Gillette should be dismissed from this action. Furthermore, it is undisputed that Gillette took no part in the decision to terminate plaintiff's employment. Plaintiff testified that Gillette was not his direct supervisor and took no part in the decision to terminate his employment. Simmons Dep. at 77-78. In his affidavit, Gillette stated that while he was aware that plaintiff's employment was terminated on October 1, 2007, he "did not participate in the discharge decision." Gillette Aff. at ¶ 8 (docket no. 60-6). Appell and Fields made the decision to terminate plaintiff's employment after they met with plaintiff on September 28, 2007. Appell Aff. at ¶ 15 (docket no. 60-4); Fields Aff. at ¶ 12 (docket no. 60-5). The undisputed record established that Fields, Appell and Schmitz were the only individuals that signed the October 1, 2007 "termination request/report form," which terminated plaintiff's employment for insubordination. *See* docket no. 60-4 at p. 11. Because Gillette was not a decisionmaker with respect to terminating plaintiff's employment, plaintiff cannot rely on Gillette's statements for purposes of establishing direct evidence of discrimination in violation of § 1981. *See Geiger*, 2009 WL 2836538 at *4.

Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that Appell, Fields and Schmitz played a role in the decision to terminate plaintiff's employment. However, there is no direct evidence that any of these decisionmakers had a

11

discriminatory motive with respect to terminating plaintiff's employment on October 1, 2007. Accordingly, defendants are entitled to summary judgment as to Count III with respect to plaintiff's claim based upon direct evidence of discrimination.

**b.     Plaintiff has not demonstrated indirect evidence of discrimination**

Plaintiff also contends that there is indirect evidence of discrimination. Under the *McDonell Douglas* framework, a plaintiff must establish a prima facie case of discrimination by showing that "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Newman*, 266 F.3d at 407. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Allen v. Highlands Hospital Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (analyzing age discrimination claim). If the employer articulates a legitimate nondiscriminatory reason, then the burden of production shifts back to the plaintiff to show that the employer's explanation is a mere pretext for discrimination. *Id.* At this step, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (analyzing age discrimination claim).

Here, plaintiff has established the first three elements of a prima facie case of race discrimination. However, plaintiff has failed to present any evidence to establish the fourth element, i.e., that he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employee. Defendants presented evidence that many other hotel employees were discharged on the same grounds as plaintiff. Specifically, Appell stated in her

affidavit that since December 2004, the hotel discharged eight employees (including Caucasian employees) for insubordination and approximately 70 employees (including Caucasian employees) "for inability/refusal to work requested hours." Appell Aff. at ¶ 18. Plaintiff's response to this affidavit consists of speculation that the employees identified by Appell were not similarly situated to him (i.e., "it is less clear whether those employees had an oral employment agreement or whether insubordination was fabricated against them, as in this case"). *See* docket no. 65 at p. 22. However, plaintiff's mere speculation that he may have been treated differently from similarly situated Caucasian employees is insufficient to establish a prima facie case. Accordingly, defendants are entitled to summary judgment with as to Count III with respect to plaintiff's claim based upon indirect evidence of discrimination.

### 2. Intentional discrimination pursuant to § 1981a (Count IV)

Plaintiff has also brought a claim for intentional discrimination pursuant to § 1981a in Count IV. The court previously concluded that § 1981a does not create a separate cause of action for "intentional discrimination."

> "Implicit in § 1981a is the requisite that an action will not exist under the Civil Rights Act absent a primary claim under another substantive act. In short, there is no such thing as a § 1981a claim." *Bennett v. Calabrian Chemicals Corp.*, 324 F. Supp. 2d 815, 839 (E.D. Tex. 2004) (citations and internal quotations omitted). *See Powers v. Pinkerton, Inc.*, 28 F. Supp. 2d 463, 472 (N.D. Ohio 1997), *aff'd* 168 F.3d 490 (6th Cir. 1998) ("a claim based on § 1981a does not afford an independent ground for relief but is a statutory provision for additional recovery of damages in Title VII cases").

Docket nos. 67 at p. 15, 74. Because plaintiff cannot maintain an independent claim pursuant to § 1981a, defendants Appell, Fields, Schmitz and Gillette, they are entitled to summary judgment with respect to plaintiff's claims alleged in Count IV.

13

### 3. Back pay and front pay [2]

Finally, defendants assert that plaintiff is not entitled to "back pay" or "front pay" because he has made no effort to seek employment since October 1, 2007. An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975). "As a general rule, when a court finds discrimination, it must award backpay," relief which has been characterized as "an equitable award intended to make the plaintiff whole." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168, 1171 (6th Cir. 1996) (addressing claims brought under Title VII and § 1981). Backpay is generally computed from the date of the discriminatory act until the employee obtains a final judgment. *See, e.g., Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 753 (6th Cir. 1985); *E.E.O.C. v. Monarch Machine Tool Company*, 737 F.2d 1444, 1452-53 (6th Cir. 1980). A plaintiff seeking backpay in an employment discrimination action has a duty to mitigate his damages "by seeking suitable employment with reasonable diligence." *Id.* at 1168. *See generally, Ford Motor Company v. E.E.O.C.*, 458 U.S. 219, 231-32 (1982) (in considering a plaintiff's reasonable diligence in seeking new employment, the court observed that while the plaintiff does not need to "go into another line of work, accept a demotion, or take a demeaning position," the plaintiff "forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied").

---

[2] If the district court adopts the recommendation to grant defendants summary judgment with respect to Counts III and IV, then it will be unnecessary to address this issue of damages.

At his deposition, plaintiff testified that he is claiming back pay from the date of his termination in the amount of $240.00 per week. Simmons Dept. at 97-98.[3] Defendants contend that plaintiff is not entitled to back pay because he has not exercised "reasonable diligence" in seeking to mitigate his alleged damages. In support of their motion, defendants presented evidence that from October 1, 2007 through June 11, 2009, the Sunday "want-ads" section of the Kalamazoo Gazette listed 42 laundry attendant/housekeeping job openings and 222 general labor, manufacturing and production job openings. *See* Harner Aff. (docket no. 60-7). Defendants contend that these jobs are consistent plaintiff's testimony that he is qualified to be a laundry attendant or a general factory worker. *Id.* at 94-95. At his deposition, plaintiff testified that he has not looked for employment, even though he has no physical problem that prevents him from becoming employed and has access to the internet. *Id.* at 94-95. Despite the availability of other employment in the Kalamazoo area that plaintiff could perform, and the means to search for employment on the internet, plaintiff has made no attempts to find employment since his termination from the hotel. *Id.* at 94. Rather, plaintiff testified that his current occupation is pursuing this litigation ("[w]orking on this case . . . It's become my job") and that he sleeps during the day and works on his case "[u]sually from 9 in the evening until 3 in the morning, 4 in the morning." *Id.*

Based on plaintiff's testimony, it is undisputed that he took no steps to seek suitable employment from the date of his termination (October 1, 2007) through the date of his deposition (January 6, 2009). Viewing the evidence in the light most favorable to plaintiff, the court concludes that he is not entitled to claim back pay during this period of time. While plaintiff may occupy

---

[3] This weekly amount is based upon plaintiff's testimony that he would earn an hourly rate of $8.00 and work 30 hours per week. Simmons Dep. at 97-98.

himself by sleeping during the day and working on his lawsuit during the night, such activity cannot be construed as a reasonably diligent attempt to obtain new employment. Accordingly, defendants are entitled to partial summary judgment with respect to plaintiff's claim for back pay from October 1, 2007 through January 6, 2009.

Defendants also seek summary judgment on the issue of "front pay," which has been defined as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Defendants, however, have failed to present the court with any legal authority or factual basis for granting their claim for summary judgment on the issue of front pay. *See In re Moncier*, 550 F. Supp. 2d 768, 782 (E. D. Tenn. 2008) ("this Court cannot consider and respond to what is not provided"). Accordingly, defendants' motion for summary judgment should be denied with respect to the issue of front pay.

  **D.**  **Plaintiff's motion for judgment on the pleadings/summary judgment (docket no. 62)**

Viewing the evidence in the light most favorable to plaintiff, the court concluded that defendants are entitled to summary judgment in this action. Accordingly, for the reasons as stated in this report, plaintiff's cross-motion for summary judgment should be denied.

  **IV.**  **Recommendation**

I respectfully recommend that defendants' motion for summary judgment (docket no. 59) be **GRANTED**, plaintiff's motion for judgment on the pleadings/summary judgment (docket no. 62) be **DENIED** and that this action be dismissed.

I further recommend that if the court does not dismiss plaintiff's action in its entirety, then defendants' motion for summary judgment should be **GRANTED** as to plaintiff's claim for back pay from October 1, 2007 through January 6, 2009.


Dated: October 13, 2009                    /s/ Hugh W. Brenneman, Jr.
                                           HUGH W. BRENNEMAN, JR.
                                           United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).